THE DEPARTMENT OF TRANSPORTATION, Plaintiff-Appellant, *v.* WESTERN NATIONAL BANK OF CICERO, as Trustee, *et al.*, Defendants-Appellees.

(No. 73-6; ▮▮▮▮▮▮▮▮▮▮▮▮

Second District—September 16, 1974.

William J. Scott, Attorney General, of Springfield, and Frank M. Daly, of Waukegan, for appellant.

Morrison & Nemanich, of Waukegan, for appellees.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This appeal arises out of an eminent domain proceeding whereby the State of Illinois, Department of Transportation, seeks to acquire land for the reconstruction of an existing freeway.

The jury found that the value of the land taken was $80,000. No issue is involved as to the just compensation for the land taken. The jury further found that the damage to the remainder not taken was $127,000. It is admitted that there is some damage to the remainder, because the taking would disrupt part of the sewer and water mains and roads servicing the property not taken. The engineer for the Department testified that the cost for such reconstruction would be $32,792.10. The engineer for the property owners testified that such cost would be $45,643. However, as indicated above, the jury brought in a verdict of $127,000 for the damage to the remainder. It is obvious that the jury based its award, in part, upon the loss of access to the property not taken. The basic question is whether, under the facts presented herein, the property owners are entitled to damages to the remainder for loss of access.

A brief statement of the facts will help to outline the issues developed at the trial. For several years prior to 1957 the defendant, Murphy, and members of his family, owned and operated a gas station and trailer park at the intersection of Route 43 (then known as Telegraph Road) and Route 120 (also known as Belvidere Road). The property at that time had direct access to both Route 43 and Route 120 from this intersection.

In 1957 the Department of Transportation of the State of Illinois (hereinafter referred to as the "State") began acquiring property to improve Route 120 and make it a freeway. In so doing, it became necessary to alter the intersection of then Telegraph Road (Route 43) and Route 120 and for this purpose the State acquired the lots at the southeastern corner of the Murphy property. (This was the northwestern corner of the intersection.) The State acquired this land after negotiations with Mr. Francis Murphy by a document entitled "Dedication of Right-of-Way

for a Freeway" which document was properly executed by Murphy and the other members of the Murphy family who were the co-owners for the consideration, as recited therein, of $125,000. The deed of dedication, after legally describing the land to be dedicated, concluded:

"And the grantors, further as part of this dedication, on behalf of himself, his heirs, executors, administrators and assigns, does hereby release, quit claim and extinguish any and all rights or easement of access and crossing under which the tract of land herein conveyed and dedicated might otherwise be servient to abutting lands of the grantor.

Notice to vacate premises herein shall not be given by the Department of Public Works and Buildings to the grantors herein prior to April 1, 1958."

After the land described in the above quoted document had been acquired the State constructed a frontage road running south from Washington Street (an east-west street several blocks north of the property, just inside Route 43), along the east edge of the property, then curving alongside the southern edge of the trailer park running in a westerly direction parallel to and north of Route 120. At the point where the frontage road turned west an access was constructed from the frontage road onto Route 120. While the State contended this was an illegal or "bootleg" entrance, not built by the State, Murphy testified it was built and maintained by the State. It is undisputed in any event, that the State put up and maintained "Stop" signs at this entrance from Route 120. At a point some three blocks west of the access point above described another access road was provided from Route 120, which the States does not deny was constructed and maintained by the State, including "Stop" signs. Following the 1958 purchase of some of the property by the State Murphy acquired additional land to the north and west and certain streets were laid out and were connected with the frontage road. Some of these later were vacated.

In 1971 the State determined that it was necessary to again widen and improve Route 120 and accordingly this condemnation action was begun in 1972 to acquire additional land of the defendant for said improvements. The taking of such land and the widening of the highway as planned required the elimination of the access point nearest the intersection of Route 120 and Route 43 and this is what poses the question of damage to the remainder of the property not taken.

At the trial, Murphy testified that in late 1957 he negotiated with the State for the purchase of the lots acquired by the State in the first transaction in 1958. He could not recall the exact date of such negotiations nor

the name of the person who represented the State, but testified that he had an attorney representing him in the negotiations. However, the attorney only handled "the money situation and some dram shop suits that were against us." Murphy testified that he had nothing in writing from the State but that one of the right-of-way representatives of the State—whose name he did not recall—told him that a "by-pass road" would be built for an exit to and from Washington Street and that as to Route 120 "we would always have a good access entrance" and "that such access would be at two points, approximately where the access was at the time located and another access some two or three blocks west."

On cross-examination Mr. Murphy said he talked with "one or two" negotiators, one in about July or August of 1957, the other possibly a month later, but he did not recall the names of either of them. He acknowledged signing the deed of dedication in January of 1958 and said he "went over the legal part and discussed it" with his lawyer before he and the other co-owners signed it. Mr. Murphy testified there never was any other person present when he negotiated with the State Highway Department representative.

Following Murphy's testimony the trial judge, after argument by counsel, ruled that the language of the dedication of the right-of-way respecting relinquishment of access is "uncertain" and that uncertainty and the actual physical layout of the streets, private, public or otherwise from the Murphy property to the frontage road "all must militate against the State." Accordingly, the judge ruled at that point that the question of loss of access might be submitted to the jury as part of the damages to the remainder.

Upon the State's counsel suggesting that he would proceed to put Mr. Murphy on the stand to ask him about the dedication and the money he received for it, defense counsel objected in the following language:

"I want to say now, your honor, that I would object to any mention of the price paid to Mr. Murphy in 1957 because if that is mentioned quite clearly what we are going to have to do is try the 1957 case too, to show that he was justly compensated in 1957, which is impossible."

After some further discussion the trial court sustained the objection. The court subsequently ruled the dedication deed should not be discussed in the presence of or shown to the jury.

The State contends it was error for the trial court to allow the jury to consider the evidence of damage to the remainder by reason of loss of one point of access to Route 120, while excluding from the jury's consideration the deed of dedication and the consideration paid for it by the State in 1958.

■■ It is well settled that the language of a deed is not subject to construction unless such language is ambiguous or unclear. If the language of a deed is clear, definite and certain, then its intent is to be gathered from within the four corners of the instrument itself without recourse to extrinsic evidence or any of the rules of construction necessarily employed to resolve the meaning of an ambiguous document. Reading the deed of dedication in evidence here it seems to us that so far as the instrument itself is concerned it is clear, definite and certain and thus affords no room for construction as to its intent. (*Patton v. Vining* (1958), 14 Ill.2d 11; *Corbridge v. Westminster Presbyterian Church & Society* (1958), 18 Ill.App.2d 245.) What the trial court was evidently referring to when he remarked that the language of the deed was uncertain was that the conduct of the parties subsequent to the deed was inconsistent with the deed, thus rendering the intent of the parties uncertain.

■■ It is true that the State, subsequent to the deed did construct, or allow the existence of, two access points from the frontage road onto Route 120 and Murphy, for his part, evidently laid out his property with reference to these access points as if they were established rights-of-way, all of this being inconsistent with Murphy's relinquishment of access. But, a careful reading of the deed of dedication discloses that what was given up in the deed was not any particular access over the servient land but the *right* of access. The State was not required to close or forbid access from Murphy's property to Route 120 but Murphy did agree that he no longer could assert the right of access which a dominant estate has over the servient estate. Mere failure of an authority, municipal or state, to object to a continued use inconsistent with a dedication does not in itself establish a right to the continued use. (*City of Quincy v. Sturhahn* (1960), 18 Ill.2d 604.) Moreover, we are dealing here with the State of Illinois and any agreement whereby the State would surrender its right to control rights of access on heavily traveled highways such as freeways would be against public policy. (*Village of Lake Bluff v. Dalitsch* (1953), 415 Ill. 476. See also 26 C.J.S. *Dedication* § 31, at 457 (1956).) It is not to be presumed that the State of Illinois relinquished its right to control access onto Route 120, based merely on the fact that the State continued to allow access when it was within its power to deny such access. (*City of Quincy v. Sturhahn, supra.*) The general rule is that agreements made or negotiated prior to the execution of a deed are merged in the deed and the burden is on the party asserting a separate agreement to establish that such separate agreement was outside the deed. (*Stromsen v. Stromsen* (1947), 397 Ill. 260.) The conversation testified to by Murphy between Murphy and the State representative was some months before the deed of dedication was signed. Since the State could not, without violating

its highest duty to provide safe highway conditions, agree to give up *indefinitely* control over access to a heavily traveled highway, we must assume that the agreement as to access was not intended as a perpetual grant. That the State subsequently permitted access onto Route 120 despite the relinquishment clause does not establish a vested right in Murphy to such access. The building of the frontage road was normal policy and it served other persons in the community as well as Murphy. It was not evidence of an obligation to Murphy, but was a normal traffic control for heavily traveled highway conditions. The State admitted building only one access point to Route 120, contending that the one nearest the intersection with Route 43 was not authorized, but in any event, whether it existed by design or only by sufferance, the mere physical existence of the access does not establish that the State gave up the right to deny access when and if its existence became incompatible with the needs of the State in designing an adequate and safe highway. Except for the dedication instrument the physical fact of the existence of the access point would suggest a right in Murphy, inherent in the ownership of the abutting dominant land, to have the access continue or to be compensated for its loss, but without a clear showing that the deed was not intended to apply to this particular access it seems to us that the language of the deed, plus the logic of the State's rights and duties as the sovereign to provide safe highways, militates against the contention of Murphy that he had acquired a vested right to the maintenance of this particular access.

We are not dealing here with a promise made and not kept. If the State made the promises indicated by Mr. Murphy's testimony, it kept them—it built the frontage road and allowed or constructed two access points—this in addition to the $125,000 paid to Murphy. But, the State reserved the right at the same time to close off the access point if and when proper highway construction required it for the safety of the general public. We think the trial judge was in error in holding that the State must respond in damages under these circumstances, thus treating certain language of the dedication deed as a nullity.

■■ While it is our opinion, therefore, that the submission of the question of damages to the remainder, based on loss of access, was not proper in the present state of the record, another point raised by the State and assigned as error should be clarified at this time to avoid further error, in the event of a new trial.

Expert witnesses testified on behalf of Murphy that while the *present* highest and best use of the property was for a trailer camp, there was a potential use in the fairly near future as a commercial site which, provided proper zoning could be obtained, would then probably be the highest and best use of the property. There was no evidence as to reasonable

expectation of such zoning in the near future. To the assumption that the highest and best use might change in the foreseeable future—within 2 to 5 years—was added the assumption that zoning for such commercial use would be granted, and to this was added the further assumption that the zoning authorities might be reluctant to provide commercial zoning for a site which must be approached through a residential street, as would be true of the presently contemplated route from Route 120 to the trailer park.

■■ We think these considerations are too speculative to provide a proper basis for calculation of damages to the remainder by the jury. It is true, of course, that several Illinois cases have held that it is proper to base value upon the highest and best use permitted, "not only under existing limitations but also under other zoning limitations—where there is a reasonable probability of the granting of such zoning in the near future" (*Lombard Park District v. Chicago Title & Trust Co.* (1968), 103 Ill.App.2d 1, 7), but in those cases the defendant's witnesses testified as to the *present* potential highest and best use of the land if zoning laws permitted a change to such use. In the case before us it was agreed by witnesses for both sides that at *present* the highest and best use of the land was for a trailer park. The possibility that this highest and best use would become commercial was based on the trends in other communities and surrounding developments. Whether the "march of progress" is so inexorable and certain we do not know. A saturation point might very well be reached for commercial sites before the value of this particular site as a trailer park declines. If the *present* highest and best use was for a commercial site this case would fall into the category of *Lombard Park District, supra,* and *Department of Public Works & Buildings v. Rogers* (1968), (*aff'd,* 39 Ill.2d 109) but it goes a step further than those cases reach and in our opinion becomes speculative. This evidence, we believe, should not have been considered by the jury in connection with the damages to the remainder. (*City of Chicago v. Lord* (1917), 276 Ill. 571.) Moreover, under section 4—210 of the Illinois Highway Code (Ill. Rev. Stat. 1971, ch. 121, par. 4—210) the State clearly has the right to determine whether egress or ingress shall be allowed at a particular point onto a freeway. Even if we were to adopt Murphy's theory that he acquired, by oral agreement, some vested, permanent right in the maintenance of an access onto Route 120 for the uses of his *trailer park,* it is obvious that this is not the same as an access for the use of a *commercial site.* The latter would be much more dangerous and could not be said to be within the contemplation of the original agreement, whatever that portended for the existing site. (*Department of Public Works v. Finks* (1956), 10 Ill.2d 20.) In our opinion it cannot reasonably be implied

54

that anyone would buy the land in question as a commercial site on the expectation of being able to maintain this particular point of access, amounting in reality to a direct access onto the freeway from such commercial site. The consideration of damage to the remainder *as a commercial site* by reason of the loss of the particular access in question was, therefore in our opinion, prejudicial to the State and should not have been allowed.

For the reasons we have discussed there must be a new trial.

Reversed and remanded for a new trial.

GUILD and SEIDENFELD, JJ., concur.